## MURPHREE *v.* STATE.

(In Banc. Dec. 9, 1946. Suggestion of Error Overruled Jan. 13, 1947.)

[28 So. (2d) 238. No. 36273.]

W. E. Gore, Creekmore & Creekmore, J. G. Burkett, and **Will S. Wells,** all of Jackson, for appellant.

Greek L. Rice, Attorney General, by George H. Ethridge, Assistant Attorney General, and W. D. Conn, Jr., special counsel, for appellee.

38

Argued orally by **H. H. Creekmore**, for appellant, and by **Geo. H. Ethridge** and **W. D. Conn, Jr.**, for appellee.

**McGehee, J.**, delivered the opinion of the Court.

The indictment against the appellant, Tom Murphree, is that by virtue of his public employment as Chief Clerk in the License Tag Division of the State Motor Vehicle Commission, he came into possession of the sum of $356 of public money which he failed to pay over to the Motor Vehicle Commissioner. To sustain this charge, the proof offered by the State was to the effect that Murphree received three certain checks of the Folse Drayage Company, Inc., of New Orleans, Louisiana, payable to the Motor Vehicle Commissioner, for the sums of $60, $98 and $198, respectively, in payment for temporary permits Numbered 86,987; 86,995; and 86,999, issued by him to the said drayage company on October 7, 1942, November 10, 1942, and January 14, 1943, respectively. That these checks were duly endorsed by the general bookkeeper and deposited in the bank to the account of the Motor Vehicle Commission. That is to say, they were accounted for in that the proceeds thereof were paid over to the Commission; but that, although the said checks were thus accounted for, the duplicate of each of the said permits which were issued in triplicate were extracted by someone in the meantime from a receptacle commonly referred to in the testimony as a "cigar box," which was kept at the office in an unlocked drawer, and that the corresponding amounts of cash were likewise taken from this cigar box, leaving the books of the office in balance since the duplicates of these three permits were never entered of record or thereafter accounted for.

It was also shown that these three permits in particular were issued out of the permit book of a field man, Mr. Baylis, who had left the employment of the Commission some time prior thereto on or about June 30, 1942, when the book was turned in by him to someone in the office; that during the busy season of the year for making collections, within which these three permits were issued, the entire office force and four or five of the field men

would stand at a high desk in the office where they all were engaged throughout the day in issuing such permits out of any field man's permit book nearest at hand or from the office permit books, indiscriminately; that each of those thus engaged in the work, and who were under bond in like penalty as that of the chief clerk, had equal access to the cigar box in which they were placing the duplicate permits, checks and cash, and taking out money for making change for the purchasers there present, and frequently for cashing their own and other personal checks; and that after the close of a day's collections, which at times amounted to nearly $100,000 per day, these duplicate permits, checks and cash were removed by someone from this temporary and common depository and spread out on a table to be counted by several persons to ascertain whether or not the amount of the checks and the cash was in balance with the amount of the duplicate permits issued on that day.

That the defendant Murphree, although not a book-keeper and not shown to have been assigned such duty by the Commissioner, assumed to enter on the books of the office kept by him in the License Tag Division the numbers of the permits and the corresponding amount of money collected for each; that these entries were often made from the data called off or furnished to him by those who had counted and balanced the permits with the amount of the checks and cash, either at the close of the day's business or on the next day thereafter; and that the entries on the duplicate permit and cash books which were ordinarily thus kept by Murphree were made by an assistant clerk during his absence from the office for a few days from time to time, although it was specifically shown that he was present and making the entries at the time the check for $198 was received on January 14, 1943. However, if this or any other duplicate permit and its equivalent in cash had been theretofore extracted from the cigar box by some other person, he could not of course enter the same on these books, nor would he

have then necessarily recalled having issued a particular permit by number and amount.

That the duplicate permits, checks and cash were then carried sometimes by one person and then another to the general bookkeeper who made the necessary entries on her books as to the numbers of the permits and the amount of the collections, and then returned the duplicates to the License Tag Division, before depositing the money in the bank to the credit of the Motor Vehicle Commission.

That it was not discovered by the Legislative Investigating Committee until 1945 that the original of these three permits were held by the Folse Drayage Company. That thereupon a search of the books kept by Murphree and those kept by the general bookkeeper revealed that the numbers thereof had not been entered on any of the books. That a further search revealed that the field man's permit book out of which these three permits had been issued could not be found in the office, but that the defendant Murphree had then been in the Army for at least two years. And the State was unable to contradict his testimony to the effect that this permit book was left in the office so far as he was concerned when he entered the armed forces in July, 1943, except to the extent that it was contradicted by the inference that arises from the mere fact that it was not there when searched for in 1945.

It was not shown that the three license permits in question, Nos. 86,987, 86,995, and 86,999 were issued and taken out of the Baylis permit book between any of the unused permits, so as to support an inference that such book was thus used for the purpose of concealment. Whether or not the intervening numbered permits were issued by Murphree or someone else in due course, and duly entered of record in the separate book, if issued by a field man, in which the numbers were supposed to be entered in contrast with their grouping into one entry on the book kept by Murphree as, for instance, Field men —"temporary permits—$1,113.00," is not shown. If

such had been the case, then no unfavorable inference against the accused could be drawn from the fact alone that he used a permit book of an employee who was no longer working for the Commission; and this is especially true when coupled with the further fact that all of those issuing permits used any book found most conveniently at hand.

The record being wholly silent as to what other permits were issued from the Baylis book and entered of record, as aforesaid, and there being no specific proof that this book bore any identification marks whereby Murphree would have been put on notice that it was the Baylis book, the suspicious circumstance, of his use of a book issued to a person who had left the employ of the Commission, loses its principal significance, in view of his undisputed testimony, when he accepted as true at the trial the statement in that behalf of the lady who worked in another office and issued the book to Baylis, and who had kept an independent record of the permits by number contained therein, that "Otherwise, I had no way of knowing." If it be assumed that Baylis had issued permits therefrom, and that the triplicates thereof, bearing his signature, were in the book, so as to indicate to Murphree whose book it was, it is further true that under the practice which the employees followed, of using each other's books indiscriminately, the same may have likewise contained triplicates bearing the signatures of other employees who were still working for the Commission.

From the foregoing facts, and there is no substantial conflict in the evidence throughout the entire record on any controlling fact or circumstance in the case, it will be readily seen that the proof as to who may have removed from the cigar box the duplicates of these three permits and the equivalent amounts in cash represented by the three checks of the Folse Drayage Company, is dependent entirely upon circumstantial evidence  And it is well-settled by the criminal law of this State, and of all other enlightened jurisdictions, that where the guilt of an ac-

cused is to be based upon circumstantial evidence, the proof thereof must exclude every other reasonable hypothesis consistent with innocence. In the instant case, the other reasonable hypothesis appears from the proof on behalf of the prosecution, in that it is undisputed as aforesaid that any one of the several employees having access to the cigar box were afforded the same opportunity for removing the duplicates, and the equivalent thereof in cash, on each of the days when these duplicates, respectively, disappeared. Unless the proof is otherwise sufficient to show that the accused got the $356, the fact that he is designated "Chief Clerk," will not suffice to justify a verdict of guilty.

It is conceded that the defendant Murphree took off an hour for lunch each day, during which time the work of issuing permits and making collections continued, and that he was frequently out of the office for a few days from time to time.

This brings us to the State's theory that since Murphree was not indicted for the unlawful conversion of these funds to his own use, but for failing to account for and pay over to the Commissioner the sum of $356 in cash collections upon the theory that this money had come into his possession as chief clerk, and that therefore "it became immaterial as to who actually made away with the money, . . . whether Murphree or someone else." To sustain this theory—the application of which under given circumstances may often mean a vicarious suffering unknown to the requirements of man-made law under our constitutional system of government—the State relies upon the case of Hemingway v. State, 68 Miss. 371, 8 So. 317; McInnis v. State, 97 Miss. 280, 52 So. 634; and Sanders v. State, 141 Miss. 289, 105 So. 523. But in the Hemingway case the accused was not merely the chief clerk in the State Treasury Department. He was charged with certain statutory duties as State Treasurer in regard to accounting for the funds coming into his own possession as an officer. No such duties were imposed by any statute

upon Murphree as chief clerk of the License Tag Division or assigned to him by the Commissioner, so far as the proof in the instant case discloses. Moreover, in the Hemingway case, even though the trial court held that the prosecution had made out a prima facie case and granted an instruction for the State to the effect that it devolved upon the accused to explain what became of the money in question, and to give a reasonable excuse for his failure to pay it over, the court also granted thirty-seven instructions in favor of the defendant, several of which emphasized that in order to convict it was necessary for the jury to believe ''that the defendant, and no other, unlawfully converted it (the money in question) to his own use, or that he, having it, wilfully withholds it from his successor.''

In the later case of McInnis v State, supra [97 Miss. 280, 52 So. 636], wherein the statute provided punishment for either the unlawful conversion to the officer's own use or for an unlawful failure on his part to pay over, the Court said that ''The object was to punish for an unlawful appropriation to his own use, and this may be done by showing either an unlawful conversion or an unlawful failure to turn over when required by law so to do.'' Thus, it will be seen that fundamentally it devolved upon the prosecution to show that McInnis was guilty of ''an unlawful appropriation to his own use'' of money which had come into his possession, even though such fact of conversion by him could be established to the satisfaction of the jury in either one of the two ways above mentioned.

And in the case of Sanders v. State, supra [141 Miss. 289, 105 So. 526], it was charged that the accused had unlawfully converted certain money to his own use, and the Court held that it was neither necessary to charge in the indictment nor to state in the instructions to the jury that the act complained of was done with the intent to cheat and defraud. Obviously, when the proof for the State discloses that a person has unlawfully converted trust funds to his own use and benefit, it would necessar-

ily follow as an inevitable consequence that he did so with the intent to cheat an defraud. It was evidently for that reason that the Court stated in its opinion that "the state was not required to go beyond the averments of the indictment with its proof."

In the instant case, the several employees engaged in issuing permits and collecting money therefor were using the cigar box as a receptacle for pooling their collections. Under this system, these funds were no more in the possession of the defendant Murphree than they were in the possession of several other bonded collectors, until after an opportunity had been afforded to each and all of them throughout the day to remove a duplicate and its equivalent in cash therefrom. The same duty rested upon the other employees to leave these duplicates and the cash in the cigar box until the same could be counted and entered upon the book as rested on the defendant—a mere "straw boss"—under the system employed.

Section 9376, Code 1942, provides, among other things, that "The Commissioner is hereby vested with the sole and exclusive power and authority and he is hereby charged with the duty of administering" the provisions of the Motor Vehicle Act. Section 9377, Code 1942, gives the Comimssioner power and authority to make all rules and regulations necessary to contribute to a more efficient administration of the Act, and provides that such rules and regulations, when made, shall have binding force and effect as if incorporated in the statute. Section 9380, Code 1942, provides for appointment of a chief clerk and other employees by the Commissioner, with the approval of the Governor, and that they shall be under the control and direction of the Commissioner, and the Commissioner is authorized to assign to them their duties. Since the statute does not prescribe the duties of the chief clerk, and there was no proof offered to show what rules or regulations were made or as to what duties were assigned to him, he cannot be held criminally responsible for the failure to change the indefensible system of making and

handling collections hereinbefore set forth where it is shown that he merely followed the system which was already in force when he assumed the work as chief clerk in the License Tag Division,—a system which a former assistant Motor Vehicle Commissioner testified he was ashamed of, and who has since set up a more efficient system as an employee of the Commission under the new Comptroller.

From the foregoing views, it follows that we are of the opinion that the evidence was insufficient to warrant a conviction, and that the defendant was entitled to a directed verdict in his favor, as requested in the trial court.

Reversed, and judgment here for the appellant.

**Sydney Smith, C. J.,** did not participate in this decision.